Charles E. **JOSEPH**

v.

**KRULL WHOLESALE DRUG CO.**

Civ. A. No. 15362.

United States District Court
E. D. Pennsylvania.

Dec. 19, 1956.

Following preliminary meetings with the officers of the defendant company,[1] the plaintiff, Charles E. Joseph, on Wednesday, October 17, 1951, at the Warwick Hotel in Philadelphia met with Paul D. Helfrich, President, and Harry C. Andersen, Vice-President and Secretary, of the defendant company. At this time, the latter officers presented to the plaintiff an offer of employment as sales manager for the defendant, Krull Wholesale Drug Company, on the basis of paying him $833.33 a month.[2] The agreement was to be terminable at will by either party.[3] At the meeting, the plaintiff suggested that the company make him a vice-president in charge of sales, as it would carry prestige in the trade, and also said he would like to discuss the entire thing with his wife and family and would call either Mr. Helfrich or Mr. Andersen to let them know whether he would accept the proposition offered to him.

On Friday, October 19, plaintiff called Mr. Andersen, who was at his home in Drexel Hill, Pa., from Pelham, New York, and accepted the offer. On Monday, October 22, 1951, a meeting of the Board of Directors was called, at which Mr. Paul Helfrich, Mr. Andersen and Mr. Wilton Helfrich were present.[4] As a result of this meeting, a resolution was adopted by the Board which elected the plaintiff vice-president in charge of sales of the company, effective October 29, 1951, to continue at the discretion of the Board of Directors.[5]

H. P. Abramson, Maurice Abrams, Philadelphia, Pa., for plaintiff.

Thomson F. Edwards (of Pepper, Bodine, Frick, Scheetz & Hamilton), Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case is before the court on plaintiff's post-trial motions after a jury rendered a special verdict in defendant's favor in this contract action. Considering the testimony in the light most favorable to the jury's verdict, the facts will be summarized below.

1. The first meeting took place on September 19, 1951, in New York and was followed by a meeting in the office of the Krull company in Philadelphia, on October 13, 1951, at which time Mr. Joseph was shown through the warehouse and office.

2. In addition, plaintiff was to receive a bonus for the calendar years beginning with 1952, based on the increased volume of sales of the company over the sales of the calendar year 1951. Also, he would receive $200 a month for 5 months as long as he remained with the company as payment for the expenses of the employment agency fee and for moving and traveling expenses.

3. Plaintiff testified that the agreement was for a definite term, namely, that it was to run until December 31, 1952. The jury, though, in answer to special question No. 2, disbelieved plaintiff's testimony and found that plaintiff could have been "discharged at any time in the discretion of the Board of Directors." See footnote 8 below.

4. Wilton Helfrich is the son of Paul Helfrich and is also an officer and director of the defendant company.

5. The resolution read:
"Resolved, that Charles E. Joseph, be and he is hereby elected as Vice President in Charge of Sales of the Company,

Mr. Joseph began work for the defendant on October 29, 1951, and worked in such position until Monday, April 21, 1952, when, pursuant to a resolution of the Board of Directors of the defendant company,[6] Mr. Paul Helfrich notified the plaintiff of his discharge.[7]

Plaintiff brought suit alleging a fixed term of employment to December 31, 1952, by means of a verbal contract, and demanded judgment for the loss of wages involved. Following a jury verdict on special questions,[8] establishing that the contract was entered into as described above and was to be continued at the discretion of the board, plaintiff moved to set aside the verdict and judgment entered thereon and for a new trial.

■■ To determine applicable law in a federal court, where jurisdiction is based, as here, on diversity of citizenship, the substantive rights of the parties are determined according to the forum's local law. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. See, also, Klaxon Co. v. Stenton Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.[9] Therefore, we look to the law of Pennsylvania to determine the place of contracting.

■■ When acceptance is made over the telephone, as here, the place of contracting is where the acceptor speaks. Rothenberg v. H. Rothstein & Sons, 3 Cir., 1950, 181 F.2d 345, 346; Restate-

---

effective October 29, 1951, and to continue at the discretion of the Board of Directors, at a salary of Eight Hundred thirty three Dollars and thirty three cents ($833.33) per month, which is the equivalent of Ten thousand Dollars ($10,000.-00) per annum; further to pay his hotel expenses while in Philadelphia and moving expenses from New York to Philadelphia up to the amount of One thousand Dollars (1,000.00) payable in monthly installments of Two hundred Dollars ($200.00) each; provided he remains with the Company for the full period of five months, otherwise said monthly payments to be made for the number of months employed; further to pay a bonus for the calendar year 1952 and each year thereafter as long as he remains with the Company, based on the increased volume of sales of the Company over the sales of the calendar year 1951, the amount of said bonus to be at the sole discretion of the Board of Directors."

6. The meeting of the Board of Directors was held April 18, 1952, and present were Mr. Paul Helfrich, Mr. Andersen and Mr. Wilton Helfrich. The resolution adopted read:
   "Resolved, that in view of the tardiness and neglect of duty of Charles E. Joseph in devoting the required amount of time each working day to the duties of his office, be and he is hereby discharged and removed as Vice President in Charge of Sales of the Company; effective April 21, 1952; further that the President of the Company, be and he is hereby authorized to inform Charles E. Joseph of his discharge and removal as Vice-President in Charge of Sales of the Company."

7. About a month prior to plaintiff's dismissal, the officers of the defendant company testified that a meeting was held in plaintiff's room at the Benjamin Franklin Hotel at which time he was told that the officers were dissatisfied with "the manner in which he was conducting himself in the position that he had, because he wasn't devoting his full time and attention to the position; and, therefore, it was absolutely unsatisfactory to us, and he should certainly endeavor to put in a full day's work and not continue to commute between New York and Philadelphia."

8. The special questions submitted to the jury were:
   "1. Was the offer of a position as Vice President made by defendant to the plaintiff in the Warwick Hotel on October 17 or October 19, 1951, accepted by plaintiff at the Warwick Hotel when the offer was made, rather than by a subsequent phone call from plaintiff when in New York to Mr. Andersen, Vice President and Secretary of defendant?"    "No."
   "2. Did the contract of employment provide that plaintiff could be discharged at any time in the discretion of the Board of Directors, rather than it should continue until December 31, 1952?"   "Yes." Questions 3, 4 and 5 were not answered by the jury on instructions from the court that if they answered question 2 in the affirmative that would end their consideration of the case.

9. See Meredith v. City of Winter Haven, 1943, 320 U.S. 228, 234, 64 S.Ct. 7, 88 L.Ed. 9; Gallup v. Caldwell, 3 Cir., 1941, 120 F.2d 90, 94; and Renault v. L. N. Renault & Sons, D.C.E.D.Pa.1950, 90 F. Supp. 630, 635.

ment of Conflicts of Laws, § 326, comment C. Thus, here the place of contracting was New York.[10]

■■■ In Pennsylvania the validity of a contract, so far as it may be affected by the statute of frauds, is governed by the law of the place of contracting and we must, therefore, look to the New York Statute of Frauds to determine the validity of this contract. Continental Collier-

ies v. Shober, 3 Cir., 1942, 130 F.2d 631, 633; Renault v. L. N. Renault & Sons, D.C.E.D.Pa.1950, 90 F.Supp. 630; and Bernstein v. Lipper Manufacturing Co., 1932, 307 Pa. 36, 43, 160 A. 770.[11]

In the Bernstein case, supra, the court emphasized the value of this rule when performance takes place in more than one state.[12] Here, likewise, there was performance of the contract in jurisdictions other than Pennsylvania[13] and so there

10. There was no error in the court's submitting special question No. 1 to the jury (see footnote 8) or in charging the jury that:

"A contract is formed by the acceptance of one party of the offer previously made by the other party. The place where the offer is accepted determines the jurisdiction whose law governs the contract. Now, that is why the place of acceptance is important here. It is important to know where the plaintiff was when he accepted the offer to work for the defendant."

Further, it is noted that plaintiff's counsel, though he now finds error in the above-quoted portion of the charge, subsequent to its delivery requested after the charge that the court re-emphasize the importance of deciding this question carefully (N. T. 157), as follows:

"I am not too sure, but maybe you would want to point out that it is very important to decide this question carefully as to whether it was made in New York or Pennsylvania, because their contention is that under the law if it was made in New York, there is a statute of limitations."

The court complied with counsel's wishes by adding to its charge:

"Counsel have pointed out a few matters in which I may not have made myself clear. In fact, I do not think I emphasized them sufficiently, so I am going to repeat what I previously said on these points.

"First, as to this question of where the contract was made; that is, by acceptance, because that is what forms the contract—the acceptance—that is very important in this case, because if New York law should govern, the defendant's contention is that under New York law such a contract as this must be in writing or it is not enforcible. Under Pennsylvania law there is no such requirement. It can be oral. So that I do want to emphasize to you that you must give your best consideration to all these

points, but particularly to Points 1 and 2."

11. Plaintiff cites the case of York Metal & Alloys Co. v. Cyclops Steel Co., 1924, 280 Pa. 585, 124 A. 752, for the proposition that the law of the place of performance should govern. There the court distinctly limited, 280 Pa. at page 588, 124 A. at page 753, this finding to determining " 'the mode of fulfillment and obligation and the measure of liability for * * * (a contract's) breach' " (matter in parentheses added). See, also, the more recent cases of Robert H. Fox Co. v. Keystone Driller Co., 3 Cir., 1956, 232 F.2d 831, 834, and Victorson v. Albert M. Green Hosiery Mills, Inc., 3 Cir., 1953, 202 F.2d 717, 718, 719, where the York case was cited and the law of the place of performance was found to govern when the legal consequences or the measure of damages of a contract were under consideration.

12. On page 43 of Bernstein v. Lipper Mfg. Co., 1932, 307 Pa. 36, 160 A. at page 772, the court recognized that if "the place of performance was to control [the validity of a contract as affected by the Statute of Frauds], the law would find itself in a hopeless tangle. In Goodrich, Conflict of Laws, 232, it is stated: 'Real difficulty, however, appears in cases where performance by the promissor is to take place in more than one state, and the agreement is valid by the law of one and not the other. * * * There seems nothing left but to apply the local contract rules of lex loci contractus, unless the question of validity is to be chopped up into as many pieces as there are different places for performance.' "

13. The uncontradicted testimony of Paul Helfrich was that plaintiff "was to devote a great portion of his time out in the field with the salesmen, trying to determine whether they were handling the methods of salesmanship in the proper

is present the additional reason for finding the governing law to be that of the place of contracting.

The New York Statute of Frauds, in Section 31 of the Personal Property Law, McKinney's Consol.Laws, c. 41, states:

"§ 31. Agreements required to be in writing

"Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking;

"1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime; * * *."

■■ Though the cases are not crystal clear in their holdings, it seems apparent that in a situation such as this the New York courts would apply this statute and render the contract void. See Silverman v. Indevco, Inc., Sup.1951, 106 N.Y.S.2d 669, affirmed 1951, 279 App.Div. 573, 107 N.Y.S.2d 542;[14] Lindeman v. Textron, Inc., 2 Cir., 1956, 229 F.2d 273, 276;[15] and Canister Co. v. National Can Corp., D.C.D.Del.1945, 63 F.Supp. 361, appeal dismissed 3 Cir., 1947, 163 F.2d 683.[16] See, also, Rubin v. Irving Trust Co., Sup.1951, 107 N.Y.S. 2d 847, 852, affirmed 1953, 305 N.Y. 288, 113 N.E.2d 424.[17] The latest discussion by the New York courts of this rule in Rubin v. Irving Trust Co., 1953, 305 N.Y. 288, 113 N.E.2d 424, relied upon by plain-

manner; * * *." (N. T. 72). In the minutes of the meeting of the Board of Directors of the defendant company on October 22, 1951, there is the only reference to the defendant's customers by mentioning the company's past handling of the line of Lederle Laboratories, a division of the American Cyanamid Company, located in Pearl River, New York State (N. T. 69). Also, plaintiff commuted by train between his home in Pelham Manor, N. Y., and Philadelphia and the contention is made by defendant that this too constituted performance of his employment contract (see N. T. 10, 17, 29, 30, 52–3, 70, 72, 75, 79).

14. In the Silverman case, supra [106 N. Y.S.2d 671] the New York Appellate Division, First Department of the Supreme Court, unanimously affirmed without opinion the order of the Supreme Court, Special Term, N. Y. County, Part III, whereby an oral contract, made in Pennsylvania to be performed in New York, was not rendered void by the New York Statute of Frauds, since the court held the statute substantive and instead looked to the law of Pennsylvania. The court clearly stated its view that:

"In the opinion of the court the section (31) relates to validity and, therefore has no application to the contract at bar, which so far as appears on this application, as to its validity is governed by lex loci contractus." (Matter in parentheses supplied).

15. In the Lindeman case, supra, the Second Circuit limited Rubin v. Irving Trust Co., 1953, 305 N.Y. 288, 113 N.E.2d 424, a case where the New York Court of Appeals held § 31(7) governed a contract made in Florida, to situations arising under sub-division 7 and left the question open as to all other sub-divisions of § 31. Accordingly, where a contract was made in a state other than New York, the court held that sub-division 10 did not serve as a defense.

16. The Canister case involved a similar situation to ours and the Delaware conflicts rule applied the New York Statute of Frauds.

17. However, at least one other appellate court has reached a different conclusion. See Alaska Airlines v. Stephenson, 9 Cir., 1954, 217 F.2d 295, 297, 298. The Ninth Circuit was not clear whether they read the case of Rubin v. Irving Trust Co., 1953, 305 N.Y. 288, 113 N.E.2d 424, as holding the New York Statute of Frauds as procedural or as a holding that New York applies the center of gravity rule. In either case, though, they thought the New York courts would hold the Alaska statute the one to be applied. See, also, Brandwein v. Provident Mutual Life Insurance Co., 1956, 3 Misc.2d 216, 150 N.Y.S.2d 429, 432, where the court cites the concurring opinion of Judge Desmond in Rubin v. Irving Trust Co., 1953, 305 N.Y. 288, 113 N.E.2d 424, 432, stating the New York Statute of Frauds to be procedural.

tiff, is quite different from this case.[18] From a reading of the New York cases and the Lindeman case, supra, it appears to the court that the Second Circuit has led the way by holding sub-division 10 [19] of the Statute of Frauds to be substantive,[20] and it is most likely that the New York Court of Appeals would similarly rule on the first sub-division. Plaintiff's motion for a new trial on these grounds is, therefore, denied.

Even if an appellate court were to determine that the above reasoning was incorrect and that the New York Statute of Frauds is a procedural rule, plaintiff is not entitled to a new trial for the following reasons:

■ 1. The jury's answer to special question 2 [21] found the contract to be one that is terminable at will.

■ 2. The admission into evidence of the minutes and resolutions of the meetings of the Board of Directors of defendant corporation on October 22, 1951, and April 18, 1952, was not error on the facts of this case as they appear on the record.[22]

18. In the Rubin case, a different provision of the Statute of Frauds, § 31(7), dealing with oral contracts to bequeath property, was by-passed by the court and resort was had to the public policy of protecting the testator's ability to bequeath his property to whom he sees fit and not to be challenged after death by an oral agreement limiting his power of disposition. The court recognized, at both pages 427 and 431, of 113 N.E.2d that "the statute may even be regarded as having a dual nature—both substantive and procedural," but in their situation they "realized at the outset" that "we are not dealing with the ordinary contract."

19. Sub-division 10 of the New York Statute of Frauds covers a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest.

20. See Lindeman v. Textron, Inc., supra [229 F.2d 276], where the Second Circuit concluded that the New York Court of Appeals in the Rubin case, supra, held that "because of the long-established public policy of New York against oral testimentary dispositions, subdivision 7 governed. A majority of the court (i. e., all but one judge) deliberately refused to hold that all the other subdivisions of the statute would apply to contracts made and to be performed outside New York." The court continued: "The most that can be said is that in New York that question is still open. In such circumstances, we assume that, when the question arises, the New York Court of Appeals will act reasonably; see Cooper v. American Airlines, 2 Cir., 149 F.2d 355, 359, [162 A.L.R. 318]. Accordingly, we hold that subdivision 10 does not serve as a defense here." For facts, see footnote 15.

21. See footnote 8. Plaintiff's claim that submission of this question to the jury was irrelevant and immaterial to the issues of the case and that the court's instruction was error is invalid for many reasons. Plaintiff's counsel specifically agreed to the questions submitted to the jury, and these questions, as originally drafted, were changed to conform to his suggestions. No objection was made by plaintiff to the questions as submitted. Further, plaintiff counsel's letter of November 30, 1955, to the court listed substantially similar questions for this purpose.

22. Plaintiff argues that the documents are self-serving, but this argument is not relevant as long as the documents are prepared in accordance with the terms of 28 P.S. §§ 91a–91d. See In re Deakyne's Estate, 1950, 166 Pa.Super. 527, 72 A.2d 616. Further, see Guggenheim v. Bielau, 3 Cir., 1937, 90 F.2d 326, where, under Pennsylvania law prior to the Business Records Act of 1939, the books of a corporation were held admissible in evidence against an officer of the corporation since such a party has access to such books. See, also, Miller v. Dilkes, 1915, 251 Pa. 44, 95 A. 935, and a later case on this point, Taylor v. Eden Cemetery Co., 1940, 337 Pa. 203, 10 A.2d 573.

Plaintiff has not shown that he was denied access to the books and, though he claims he did not know of their existence, such an assertion does not aid his cause since, in no light, can he be considered a stranger to the corporation and, further, the uncontradicted testimony of Mr. Andersen, Secretary of the

The rules of evidence provide that regular business entries shall be admissible as evidence of the event.[23] 28 U.S.C.A. § 1732;[24] 28 P.S. §§ 91a–91d.[25] See, also, Freedman v. The Mutual Life Insurance Co. of N. Y., 1941, 342 Pa. 404, 21 A.2d 81, 135 A.L.R. 1249.

As to these documents, there can be no question but that the records were made in the regular course of the defendant's business at or near the time of the event. The sources of information, method and time of preparation were such as to justify their admission.[26] Thus, it appears that these documents are admissible in evidence. Overfield v. Pennroad Corp., D.C.E.D.Pa.1941, 42 F.Supp. 586, 628, supplemented D.C.E.D.Pa.1943, 48 F.

---

Corporation, shows that on occasions he told plaintiff that he could get "any record that he wanted at any time" and that, in his opinion, the corporate minutes and resolutions were included therein. Williams v. Caples, 1941, 342 Pa. 230, 235, 20 A.2d 302, 305, relied on by plaintiff, is clearly distinguishable on its facts. The court there acknowledged that where "the only source of information was appellant himself, the time and method of payment are not shown in the entry, and it is the statement of a conclusion rather than a fact. Clearly it was inadmissible." United States v. Feinberg, 2 Cir., 1944, 140 F.2d 592, 154 A.L.R. 272, also is inapplicable on its facts.

23. The purpose of the Uniform Business Records As Evidence Act, 28 P.S. §§ 91a–91d, ff., was to create an additional exception to the hearsay rule in circumstances where a record of an act, condition or event was made (a) in the regular course of business, (b) at or near the time of the act, condition or event, and (c) where the sources of information, method and time of preparation were such as to justify its admission. See, for example, Cantrill v. American Mail Line, 1953, 42 Wash.2d 590, 257 P.2d 179; Richmond v. Frederick, 1953, 116 Cal. App.2d 541, 253 P.2d 977; State v. Baker, Mo.1955, 276 S.W.2d 131. The theory of the Act is that business records kept contemporaneously with, and relating to, a transaction contain a circumstantial guarantee of trustworthiness. See Fuller v. White, Cal.App.1948, 193 P.2d 100, subsequent opinion in 33 Cal.2d 236, 201 P.2d 16.

24. "§ 1732. Record made in regular course of business; photographic copies
"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

25. 28 P.S. § 91a provides:
"The term 'business' shall include every kind of business, profession, occupation, calling, or operation of institutions, whether carried on for profit or not."
28 P.S. § 91b provides:
"A record of an act, condition or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."
28 P.S. § 91c provides:
"This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it."
See, also, § 308 of the Business Corporation Law, 15 P.S. § 2852-308, which imposes upon every business corporation a duty to keep records of the proceedings of the directors.

26. The custodian and other qualified witnesses have identified them as to character and substance and have established their authenticity to the satisfaction of the court. See N. T. 64–8, 76–8, 92, 93, 110, 111. Also, see Croll v. John Hancock Mutual Life Ins. Co., 3 Cir., 1952, 198 F.2d 562, where the transcribing of notes from daily records to office records was delayed for two weeks and the court admitted the records in evidence.

Supp. 1008, affirmed 3 Cir., 1944, 146 F.2d 889.

■ These records are not conclusive as to the occurrences as testified to by defendant's witnesses and the weight of this evidence was open to attack by competent testimony contradicting them.[27] The documents are evidence of the terms of the agreement and counsel had ample opportunity to examine and cross-examine all of the witnesses on the resolutions and minutes and on all of the oral testimony concerning the agreement. Plaintiff also had ample opportunity to argue to the jury on the weight of this evidence. The court, therefore, charged the jury that these documents were inconclusive, but specifically instructed them "to consider it along with the other evidence in arriving at your decision." (N. T. 146).

■ From a consideration of all of the testimony and all of the exhibits, the jury concluded that the contract of employment provided that the plaintiff could be discharged at any time in the discretion of the Board of Directors.[28] Thus, in making its decision, the jury had

before it all offered relevant evidence and its finding may not be disturbed.

■ 3. Testimony that the defendant corporation made contracts since its incorporation in April 1934 with all of "about seven men" who have ever served as officers of the company, on a certain basis,[29] is admissible as tending to prove a practice of the defendant company not to make written contracts or contracts for definite periods of time with its various officers. Baldridge v. Matthews, 1954, 378 Pa. 566, 569, 570, 106 A.2d 809, 811.[30] See, also, 1 Wigmore on Evidence (3rd Ed.) § 92 et seq., where it is stated that:

"Whether or not sufficient regularity exists must depend largely on the circumstances of each case."

Here the testimony that the defendant had not employed any of the seven officers of the corporation since its incorporation for a stated term establishes such a sufficient regularity.[31]

The court, in considering the admissibility of this testimony, clearly referred to it as evidence of practice and never alluded to it as conclusive or binding evidence. Also, it should be noted that plaintiff's attorney did not raise this ob-

27. See Ko Eune v. State Bank, 1938, 134 Pa.Super. 108, 114, 4 A.2d 234, where the court stated that such minutes were only prima facie evidence of the transactions recorded therein and that competent testimony contradicting such minutes or showing what actually took place is admissible.

28. See special question No. 2 in footnote 8 above.

29. Mr. Paul Helfrich testified that none of the "about seven" men who ever served as officers of the company since its incorporation in April 1934 were employed by the company for a stated term and that they could be discharged at any time by the Board of Directors according to the By-Laws.

30. In the Baldridge case, supra, the court reasoned, from the analysis in 1 Wigmore on Evidence (3rd Ed.) § 92, p. 519 et seq., that:
"Whether evidence of such usage or habit is admissible to show what occurred in a specific instance depends on the 'invariable regularity' of the usage

or habit. To be admissible the usage must have 'sufficient regularity to make it probable that it would be carried out in every instance or in most instances' * * *."

31. But see Caulfield v. Aetna Life Ins. Co., 1941, 144 Pa.Super. 257, 265, 19 A.2d 575, where the court summarily upheld the rejection of evidence of the practice of a defendant insurance company in making claim investigations where plaintiff had shown compliance with disability notice requirements of the defendant's insurance policy, partially by means of a discussion with a claims investigator.
The other relevant cases that plaintiff cites are distinguishable as they involve subsequent contracts [Nowalk v. Hileman, 1935, 118 Pa.Super. 322, 180 A. 93] or the only evidence of usage was that of a single previous occasion [Roney v. Clearfield County Grange Ins. Co., 1939, 332 Pa. 447, 3 A.2d 365, and Veit v. Class & Nachod Brewing Co., 1906, 216 Pa. 29, 64 A. 871] and, therefore, not enough to approach fixed regularity.

259

jection at the end of the court's charge, although ample opportunity was allowed him when the court requested suggested additions to the charge before the jury was sent out to deliberate.

4. There is no error in the court's having admitted into evidence the testimony of W. R. Helfrich [32] that the testimony of his father, P. D. Helfrich, a preceding defense witness, concerning a meeting between plaintiff and the two Helfrichs in the Benjamin Franklin Hotel some day in the month of March 1952, was correct.[33] In permitting the restriction of direct examination of the witness to a mere corroboration of a previous witness' statement, the court was in its sound discretion excluding cumulative testimony by defense witnesses. See 6 Wigmore on Evidence (3rd Ed.) §§ 1907 & 1908; Ries v. Ries' Estate, 1936, 322 Pa. 211, 220, 221, 185 A. 288; and District of Columbia v. Leys, 1933, 62 App. D.C. 3, 63 F.2d 646.[34] See, also, 4 Wigmore on Evidence (3rd Ed.) §§ 1230 & 1244, stating that summaries of voluminous documents are acceptable in evidence in the discretion of the hearing judge.

Further, plaintiff's counsel had ample opportunity on cross-examination to have the witness fully relate the events of the meeting and he made no attempt to do so. This failure on his part waives his right to now object to the court's ruling.

5. There is no merit in any of the other reasons for new trial raised by plaintiff which have been carefully considered.

32. Since plaintiff failed to make timely objection to Mr. Andersen's testimony that, having heard Mr. P. D. Helfrich's testimony about the meetings with plaintiff, he thought the testimony correct, he cannot now be heard to object to this testimony. See 1 Wigmore on Evidence (3rd Ed.) § 18.

33. Further, the record appears to indicate that the witness never did succeed in completing his answer to the question, "Is this testimony correct" as he was interrupted by plaintiff's counsel's objection and never finished his answer.

34. Plaintiff's claim that the witness was usurping the function of the jury in determining the credibility of the previous witness' testimony is untenable since at no time was the witness' testimony given more credibility than the testimony of any other witness. The disputed testimony merely repeated the testimony of the prior witness and the determination of their joint credibility was left for the jury. See, also, Curtis v. Miller, 1921, 269 Pa. 509, 512, 112 A. 747, where the exclusion of the cumulative evidence, even if it had been error, would not be sufficient grounds for reversal.